**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MAAZ QURESHI, MATTHEW RABINOWITZ, and DANISH ARIF, individually and on behalf of all others similarly situated, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| AMERICAN UNIVERSITY, | )<br>) |
| Defendant. | )<br>)<br>)<br>) |

Civ. Action No. 1:20-cv-01141-CRC
Civ. Action No. 1:20-cv-01454-CRC
Civ. Action No. 1:20-cv-01555-CRC

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................1

STATEMENT OF THE CASE...............................................................................................2

LEGAL STANDARD.............................................................................................................5

ARGUMENT ..........................................................................................................................5

I.      Plaintiffs' Claim For Breach Of Contract Should Be Dismissed ......................................5

      A.      Plaintiffs Have Failed To Plead An Enforceable Contractual Obligation ..............6

            1.      Plaintiffs Allege No Contractual Obligation Regarding Tuition ................8

            2.      Plaintiffs Allege No Contractual Obligation Regarding Fees...................12

      B.      Plaintiffs Have Failed To Allege Any Breach .......................................................14

      C.      D.C. Law Counsels Against Second-Guessing Educational Judgments...............16

II.     Plaintiffs' Other Causes Of Action Also Should Be Dismissed ......................................21

      A.      Plaintiffs Fail To State A Claim For Unjust Enrichment......................................21

      B.      Plaintiffs Fail To State A Claim For Conversion...................................................23

      C.      Plaintiffs Fail To State A Claim Under The D.C. Consumer Protection Procedures Act .....................................................................................................25

III.    Plaintiffs' Complaint Should Be Dismissed With Prejudice ...........................................28

CONCLUSION.....................................................................................................................28

# TABLE OF AUTHORITIES

Page(s)

## CASES

*4934, Inc. v. Dist. of Columbia Dep't of Emp. Servs.*, 605 A.2d 50 (D.C. 1992) ......................... 22

*Albrecht v. Comm. on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62 (D.C. Cir. 2004) ...................................................................................... 21

*Alden v. Georgetown Univ.*, 734 A.2d 1103 (D.C. 1999) ..................................................... 16, 17

*Allworth v. Howard Univ.*, 890 A.2d 194 (D.C. 2006) ............................................................ 17

*American Univ. in Dubai v. Dist. of Columbia Educ. Licensure Comm'n*, 930 A.2d 200 (D.C. 2007) ......................................................................................... 25

*Andre v. Pace Univ.*, 655 N.Y.S.2d 777 (N.Y. App. Div. 1996) ................................................ 17

*Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv.*, 885 F. Supp. 2d 156 (D.D.C. 2012) ............................................................................................................. 22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................................... 5

*Atria v. Vanderbilt Univ.*, 142 F. App'x 246 (6th Cir. 2005) ..................................................... 17

*Basch v. George Washington Univ.*, 370 A.2d 1364 (D.C. 1977) ........................................ *passim*

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................... 5

*Beukas v. Bd. of Trs. of Farleigh Dickinson Univ.*, 605 A.2d 708 (N.J. Super. Ct. 1992) ................................................................................................................ 16

*Brantley v. Dist. of Columbia*, 640 A.2d 181 (D.C. 1994) ........................................................ 17

*Burka v. Aetna Life Ins. Co.*, 87 F.3d 478 (D.C. Cir. 1996) ..................................................... 25

*Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 130 F. Supp. 3d 236 (D.D.C. 2015) ..................................................................................................... 23, 24

*Cannon v. Wells Fargo Bank, N.A.*, 926 F. Supp. 2d 152 (D.D.C. 2013) .................................... 27

*Carty v. Author Sols., Inc.*, 789 F. Supp. 2d 131 (D.D.C. 2011) ................................................ 28

*Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080 (D.C. 2008) ........................................ 24

*Coburn v. Evercore Tr. Co., N.A.*, 844 F.3d 965 (D.C. Cir. 2016) .............................................. 5

*Democracy Forward Found. v. White House Office of Am. Innovation*, 356 F.
Supp. 3d 61 ..................................................................................................2

*Donohue v. Copiague Union Free Sch. Dist.*, 391 N.E.2d 1352 (N.Y. 1979)..............................17

*Edwards v. Ocwen Loan Servicing, LLC*, 24 F. Supp. 3d 21 (D.D.C. 2014) ................................24

*Eisele v. Ayers*, 381 N.E.2d 21 (Ill. App. Ct. 1978)..................................................................16

*El-Shifa Pharma. Indus. Co. v. U.S.*, 559 F.3d 578 (D.C. Cir. 2009), *vacated and
subsequently affirmed en banc*, 607 F.3d 836 (D.C. Cir. 2010) ........................................20

*Firestone v. Firestone*, 76 F.3d 1205 (D.C. Cir. 1996)..............................................................28

*Ford v. Chartone, Inc.*, 908 A.2d 72 (D.C. 2006) ....................................................................26

*Hinson ex rel. N.H. v. Merritt Educ. Ctr.*, 521 F. Supp. 2d 22 (D.D.C. 2007)..............................5

*Howard Univ. v. Best*, 484 A.2d 958 (D.C. 1984)....................................................................11

*Howard v. Riggs Nat'l Bank*, 432 A.2d 701 (D.C. 1981)........................................................26, 27

*Itek Corp. v. First Nat'l Bank of Boston*, 566 F. Supp. 1210, 1216 (D. Mass. 1983)....................11

*Krebs v. Charlotte Sch. of Law, LLC*, 2017 WL 3880667 (W.D.N.C. Sept. 5,
2017) ....................................................................................................................22

*Lucero v. Curators of Univ. of Mo.*, 400 S.W.3d 1, 8 (Mo. Ct. App. 2013)................................17

*MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654 (6th Cir. 2013)................................27

*Manago v. D.C.*, 934 A.2d 925 (D.C. 2007)............................................................................6

*Martin v. United Airlines, Inc.*, 727 F. App'x 459 (10th Cir. 2018)........................................14, 15

*McClean v. Duke Univ.*, 376 F. Supp. 3d 585 (M.D.N.C. 2019)................................................18

*McNamara v. Picken*, 950 F. Supp. 2d 193 (D.D.C. 2013) ....................................................23, 24

*Mosby-Nickens v. Howard Univ.*, 864 F. Supp. 2d 93 (D.D.C. 2012)................................6, 7, 10

*Moss v. Wayne State Univ.*, 2009 WL 4344193 (Mich. Ct. App. Dec. 1, 2009) ........................23

*Neiman v. Yale Univ.*, 851 A.2d 1165 (Conn. 2004) ..............................................................17

*News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218 (D.C. 2005) ....................................22

*Paynter v. New York University*, 319 N.Y.S.2d 893 (N.Y. App. Div. 1971) ..............................18

*Roe v. Loyola Univ. New Orleans*, 2007 WL 4219174 (E.D. La. Nov. 26, 2007) ........................22

*Roe v. Saint Louis Univ.*, 2012 WL 6757558 (E.D. Mo. Dec. 31, 2012), *aff'd*, 746
    F.3d 874 (8th Cir. 2014) ...........................................................................................17, 18

*Roebling v. Dillon*, 288 F.2d 386 (D.C. Cir. 1961)...........................................................22

*Ross v. Creighton Univ.*, 957 F.2d 410 (7th Cir. 1992) ....................................................17

*Sanoian v. George Washington Univ.*, No. 18-CV-911 (D.C. Mar. 3, 2020)..............................26

*Schiff v. AARP*, 697 A.2d 1193 (D.C. 1997)....................................................................21

*Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039 (D.C. Cir. 2010)..........................................26

*Shinabargar v. Bd. of Trustees of Univ. of Dist. of Columbia*, 164 F. Supp. 3d 1
    (D.D.C. 2016) .............................................................................................................7

*Shulman v. Voyou, LLC*, 251 F. Supp. 2d 166 (D.D.C. 2003)........................................24

*Stevens v. Sodexo, Inc.*, 846 F. Supp. 2d 119 (D.D.C. 2012)..........................................6

*Varner v. District of Columbia*, 891 A.2d 260 (D.C. 2006) .............................................7

*Vince v. Mabus*, 956 F. Supp. 2d 83 (D.D.C. 2013) .........................................................28

## STATUTES, RULES, AND REGULATIONS

D.C. Code § 28-3901(a)(2) ............................................................................................26

D.C. Code § 28-3901(a)(2)(B)(i) ...................................................................................26

D.C. Code § 28-3901(a)(14) ..........................................................................................25

D.C. Code § 28-3904(a)..................................................................................................26

D.C. Code § 28-3904(e)..................................................................................................27

D.C. Code § 28-3904(f)..................................................................................................27

D.C. Code § 28-3904(f-1) ..............................................................................................27

D.C. Code § 28-3905(k).................................................................................................25

D.C. Code § 28-3905(k)(1)(A) .......................................................................................26

D.C. Code § 28-3905(k)(5).............................................................................................25

Rule 12(b)(6)...........................................................................................................................5

## INTRODUCTION

In March 2020, facing an unprecedented public health crisis, American University made the difficult decisions necessary to protect its campus community while maintaining its tradition of educational excellence that dates to 1893.  After careful consideration, the University shifted to an online learning environment that allowed students to complete their semester safely and with their academic credits intact.  This transition, which required tremendous dedication and effort on the part of American's faculty and staff, resulted from the University's academic judgment about how best to educate its students.

This case is one of roughly 150 lawsuits brought challenging colleges and universities' responses to COVID-19.  In a consolidated complaint, Plaintiffs—three undergraduate students—acknowledge that, rather than withdraw from the University, they completed the Spring 2020 semester online using the instruction and resources provided by the University. Still, they contend that the University owes them a refund for the semester.  American stands behind its decisions to protect its students and to continue their education under uniquely challenging circumstances, and the University is proud of the extraordinary efforts its faculty and staff took to ensure that students experienced as little disruption to their educations as possible. No refund of tuition and fees is owed to Plaintiffs.

While these circumstances are unprecedented, the operative legal principles are well settled.  All of Plaintiffs' claims—for breach of contract, unjust enrichment, and conversion, and under the D.C. Consumer Protection Procedures Act—turn on the allegation that American failed to provide its students the education promised when the University transitioned to online learning.  But American did not promise to provide in-person instruction under all circumstances, let alone link such a promise to the payment of tuition or fees.  American's agreements with its students make clear that tuition and fees are not refundable based on how

students are taught or whether they are satisfied with their courses.  Plaintiffs' claims for unjust

enrichment and conversion suffer from similar threshold deficiencies, not least that they are

unavailable to a party who sues on an enforceable contract.  So too with the CPPA claim, which

does not permit claims pertaining to the provision of education.  These clearly established legal

principles require dismissal of the complaint.

District of Columbia law establishes that challenges to how universities offer instruction

and grant degrees are not properly heard in court.  There is no way to avoid those issues here:

Plaintiffs' claims would require this Court to assess what quality of education American

promised, what quality it delivered, and what dollar figure to assign to any difference.  Settled

D.C. law provides that neither this Court nor a jury may answer such questions.  The case should

be dismissed with prejudice.

## STATEMENT OF THE CASE

This lawsuit challenges American's efforts to protect the health and safety of its students

while maintaining continuity in their education as a result of the COVID-19 public health crisis.

In early March, the novel coronavirus began to spread across the United States and the first case

of COVID-19 was confirmed in Washington, D.C.[1]  On March 10, 2020, American University

announced that, beginning on March 18 after an extended spring break, in-person classes would

temporarily shift to online instruction to protect the health and well-being of students, faculty,

---

[1]     *See* D.C. Department of Health Confirms First Coronavirus Case, Government of the
District of Columbia (Mar. 7, 2020), *available at* https://coronavirus.dc.gov/release/dc-
department-health-confirms-first-coronavirus-case.  On a motion to dismiss, the Court may
consider documents incorporated by reference into the complaint and may also take judicial
notice of government documents from reliable sources.  *See, e.g.*, *Democracy Forward Found. v.
White House Office of Am. Innovation*, 356 F. Supp. 3d 61, 69 n.5, 71 n.9 (D.D.C. 2019).

and staff.[2]  Compl. ¶ 46.  On March 11, the World Health Organization declared COVID-19 a

pandemic,[3] D.C. Mayor Muriel Bowser declared a state of emergency,[4] and the D.C. Department

of Health recommended that non-essential mass gatherings be postponed or cancelled.[5]  The next

day, on March 12, 2020, the University issued an update announcing its decision to continue its

remote learning environment for the 29 days of instruction remaining in the undergraduate

Spring 2020 semester.[6]  *See id.* ¶ 47.  American explained that University operations would

transition to an expanded telework environment, but that the University would not be closed and

that services would be available on campus with limitations.[7]  American encouraged students to

vacate residence halls in order to lower population density on campus and fight the spread of the

virus, but it assured students that American would work with them to "provide support to

facilitate this transition," and acknowledged that some students may be unable to depart the

residence halls due to the extraordinary circumstances.[8]  *See id.* ¶ 48.  The University's

announcement emphasized that this challenging situation necessitated a temporary change to

*how* the University would complete its spring semester, not *whether* the semester would be

---

[2]  *See* Letter from Sylvia M. Burwell to the AU Community (Mar. 10, 2020), *available at* https://www.american.edu/president/announcements/march-10-2020.cfm (cited at Compl. ¶ 46).

[3]  *See* WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 (Mar. 11, 2020), *available at* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[4]  *See* Government of the District of Columbia, Mayor Bowser Declares Public Health Emergency (Mar. 11, 2020), *available at* https://mayor.dc.gov/release/mayor-bowser-declares-public-health-emergency.

[5]  *See* Government of the District of Columbia, D.C. Health Advisory (Mar. 11, 2020), *available at* https://coronavirus.dc.gov/release/dc-health-advisory.

[6]  *See* Letter from Sylvia M. Burwell to the AU Community (Mar. 12, 2020), *available at* https://www.american.edu/president/announcements/march-12-2020.cfm (cited at Compl. ¶ 48).

[7]  *Id.*

[8]  *Id.*

completed.[9]  From March 18, 2020 through the end of the spring semester, University faculty

taught classes remotely.  *See id.* ¶ 51.

As instruction transitioned online, American's faculty and staff invested significant time,

resources, and creativity into their efforts to continue students' education seamlessly.  For

example, a professor in the Performing Arts department set up videoconferencing workstations

in performance and rehearsal spaces to provide remote demonstrations.[10]  The University also

made many resources available and made several accommodations to ensure that students could

successfully navigate an undisputedly difficult time.  These efforts included setting up a

dedicated team to assist students and faculty with technology and connectivity issues,[11]

expanding pass-fail grading options for most students,[12] and expanding remote access to advising

and counseling services.[13]  American also offered students prorated refunds of housing, dining,

and parking fees.[14]

In a consolidated complaint, Plaintiffs seek a refund of tuition and fees allegedly paid for

in-person instruction and use of campus facilities.  Compl. ¶¶ 1-4.  Plaintiffs seek to represent

two classes—one of people who paid tuition to American for the Spring 2020 semester (the

Tuition Class), and the other of people who paid American fees (the Fee Class).  *See id.* ¶ 64.  On

---

[9]      *Id.*

[10]     Letter from Sylvia M. Burwell to the AU Community (Mar. 16, 2020), *available at* https://www.american.edu/president/announcements/march-16-2020.cfm.

[11]     Letter from Sylvia M. Burwell to the AU Community (Mar. 23, 2020), *available at* https://www.american.edu/president/announcements/march-23-2020.cfm.

[12]     Letter from Daniel J. Myers to the AU Community (Mar. 26, 2020), *available at* https://www.american.edu/provost/communications/march-26-2020.cfm.

[13]     Letter from Sylvia M. Burwell to the AU Community (Apr. 27, 2020), *available at* https://www.american.edu/president/announcements/april-27-2020.cfm.

[14]     *See* Letter from Sylvia M. Burwell to the AU Community (Mar. 16, 2020), *available at* https://www.american.edu/president/announcements/march-16-2020.cfm.

behalf of the Tuition Class, Plaintiffs claim that American (1) breached a contract to provide in-person education, *id.* ¶¶ 76-136, and (2) unjustly retained their Spring 2020 semester tuition, *id.* ¶¶ 137-152.  On behalf of the Fee Class, Plaintiffs claim that American (1) breached a contract to provide other in-person services, *id.* ¶¶ 153-171, and (2) unjustly retained their Spring 2020 fees, *id.* ¶¶ 172-183.  And on behalf of both classes, Plaintiffs claim that American (1) wrongfully exercised control over and intentionally interfered with their property rights by closing its campus to in-person instruction and related services, *id.* ¶¶ 184-194, and (2) engaged in unfair and deceptive trade practices in violation of the D.C. Consumer Protection Procedures Act, *id.* ¶¶ 195-211.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plaintiff's allegations are assumed to be true, but they cannot simply recite the elements of a cause of action and must be enough to raise a right to relief above a speculative level.  *See Coburn v. Evercore Tr. Co., N.A.*, 844 F.3d 965, 968 (D.C. Cir. 2016); *Hinson ex rel. N.H. v. Merritt Educ. Ctr.*, 521 F. Supp. 2d 22, 27 (D.D.C. 2007).

## ARGUMENT

### I.   PLAINTIFFS' CLAIM FOR BREACH OF CONTRACT SHOULD BE DISMISSED

Plaintiffs do not ground their contract claim in a specific, identifiable promise.  Instead they claim that language in American's Course Catalog, promotional materials, and academic policies together create an obligation to provide in-person instruction and services.  But no such promise was ever made.  The cited language in various American documents is exactly the kind of language that D.C. courts have held unenforceable.

American's agreements with its students instead prove that tuition and fee refunds are not available.  Tuition for Plaintiffs' program is linked to the credits a student receives, not the format of instruction; fees are explicitly nonrefundable; and the University retains discretion to change its programs.  And universities have discretion to decide how to carry out their educational missions—disputes over issues such as how courses are taught are outside the courts' purview.  Accepting Plaintiffs' attempt to cobble together a purported contractual promise would require the Court to restrain American's discretionary educational decision-making in a way that D.C. law prohibits.

## A.      Plaintiffs Have Failed To Plead An Enforceable Contractual Obligation

Plaintiffs fail to do the minimum necessary to plead a breach of contract: "indicate … the specific terms of [the] alleged contract" that was breached.  *Stevens v. Sodexo, Inc.*, 846 F. Supp. 2d 119, 125 (D.D.C. 2012); *see also Mosby-Nickens v. Howard Univ.*, 864 F. Supp. 2d 93, 98 (D.D.C. 2012) (explaining that the burden is on the plaintiff to "allege sufficient facts to demonstrate … the terms of the contract" (citing *Manago v. D.C.*, 934 A.2d 925, 927 (D.C. 2007)).  "[T]he relationship between a university and its students is contractual in nature," and "the terms set down in a university's bulletin become a part of that contract."  *Basch v. George Washington Univ.*, 370 A.2d 1364, 1366 (D.C. 1977).  But every word of a university bulletin does not state a contractual term.  Instead, because university bulletins "customarily contain a great deal of information concerning what the prospective student may expect when he or she enters the university community," the mere presence of certain language in a bulletin "is not enough to support a finding that the language amounted to a contractual obligation."  *Id.* at 1366-67.

"Whether a given section of the bulletin also becomes part of the contractual obligations between the students and the university … must depend upon general principles of contract

construction." *Basch*, 370 A.2d at 1366-67.  The caselaw establishes two requirements.  First, the obligation alleged "must be so definite in its terms … that the promises and performances to be rendered by each party are reasonably certain." *Id.* at 1367 (internal quotation marks omitted).  Second, a plaintiff must also plausibly allege the university's intent to be bound by a particular statement.  *See id.* (evaluating whether "the University intended to bind itself" "in the context of a university bulletin"); *Mosby-Nickens*, 864 F. Supp. 2d at 99 (looking to language of student rules and regulations and related indicia to determine intent to be bound); *Shinabargar v. Bd. of Trustees of Univ. of Dist. of Columbia*, 164 F. Supp. 3d 1, 29 (D.D.C. 2016) (noting that student honor code was not an enforceable contract because it "lacks … an intent to be bound").

Language that merely "expresse[s] an expectancy" fails to satisfy either requirement. *Basch*, 370 A.2d at 1368.  Because such language may involve "the types of words that preclude accuracy by their very nature," the alleged promises in such statements are not sufficiently defined, nor the resulting performance sufficiently certain, to create "a promise susceptible of enforcement." *Id.* at 1367-68; *see also id.* ("It is well established that mere expectancy of a continued course of conduct is not enough, even in situations where the disappointment of expectations results in a heavy financial loss.").  Similarly, language that merely "communicate[s] [the University's] expectations … to its students" does not reflect an intent by a university "to bind itself to the … provisions" containing such language. *Mosby-Nickens*, 864 F. Supp. 2d at 99; *cf. Varner v. District of Columbia*, 891 A.2d 260, 272 (D.C. 2006) ("Aspirational practices do not establish the standard of care which the plaintiff must prove in support of an allegation of negligence. … [T]o hold otherwise would create the perverse incentive for universities and their administrators to write their manuals in such a manner as to impose

minimal duties upon universities in order to limit civil liability." (internal citation, alterations, and quotation marks omitted)).

### 1.   Plaintiffs Allege No Contractual Obligation Regarding Tuition

Plaintiffs point to various sources they say obligate American to provide in-person instruction, no matter the circumstances.  None of the sources they cite, however, individually or in the aggregate, satisfy the requirements laid out by D.C. law for student-university contracts. Plaintiffs' failure to identify any binding obligation to provide exclusively in-person instruction dooms their claim for breach of contract on behalf of the Tuition Class, which must be dismissed.

*First*, Plaintiffs point to statements on American's website or in other promotional materials discussing the University's campus or its location in Washington, D.C.  Compl. ¶¶ 26, 82-83, 89-91, 94-95, 97-99.  These statements, pictures, and videos variously feature attractions around the city (for instance, the National Mall and National Arboretum) as well as pictures of campus buildings themselves.  But none of these depictions amounts to a *promise* that students would have physical access to campus no matter the circumstances.  Moreover, none of these materials has anything to do with the method of *instruction* offered to students.  These allegations thus do nothing to establish an obligation to provide in-person instruction.

*Second*, Plaintiffs cite statements about American's campus experience, but none establishes the obligation that Plaintiffs must show.  Some—for instance, discussing average class size, student-teacher ratios, the number of constituent schools and colleges, student organizations, and the diversity of the student body, Compl. ¶¶ 88, 93, 95—do not even colorably address the method of instruction, since things like class size and the makeup of the University and the student body remain the same whether instruction is provided in person or online.  And none of the remaining statements is sufficiently "definite in [its] terms" to make

8

"reasonably certain" the services that American is obligated to provide. *Basch*, 370 A.2d at 1367. American's purported "focus on experiential learning," for example, does not promise any particular service. Compl. ¶ 87. And other statements—*e.g.*, stating that American "will challenge you intellectually," inviting students to "Explore, Collect, and Grow into Global Citizens," and stating that students will "make personal connections," *id.* ¶¶ 95, 109-110—are so obviously indefinite and aspirational that they cannot conceivably give rise to a binding promise. A student who claimed he did not "make personal connections" or "Grow into [a] Global Citizen[]" self-evidently would not have a claim for breach of contract. Taken together, these statements are merely "information concerning what the prospective student may expect when he or she enters the university community," which does not constitute a contractual obligation under D.C. law. *Basch*, 370 A.2d at 1366.

*Third*, the same problem exists with the next set of documents Plaintiffs cite, which are materials provided to students after admission but before matriculation. Compl. ¶¶ 103-107. A letter stating that students "will not only benefit from—but also add value to—American University's hard-working and intellectually curious community," *id.* ¶ 105, does not spell out a definite or certain obligation to provide in-person instruction. So too with a program that invites students to campus "to experience the University firsthand," to "[l]earn more about AU," to "[h]ear from faculty about programs that interest [them]," or to "[l]earn more about academic programs." *Id.* ¶ 107.

*Fourth*, Plaintiffs are not helped in meeting their pleading burden by pointing to materials addressing American's online-only graduate programs. They note that information on these online-only programs is listed on a separate page from their own undergraduate program and that these programs each have "separate policies and cost information depend[ing] on the individual

online program."  Compl. ¶¶ 115-116.  That American offers other, online-only programs,
however, does not mean that it promised Plaintiffs an exclusively in-person program, no matter
the circumstances.

*Fifth*, Plaintiffs cite limited information from the Course Catalog (and related syllabi)
about classes typically offered in person.  In particular, they cite the fact that the Catalog lists
"information regarding the courses offered, the instructor, the days and times during which the
courses would be held, and the location (including the building and room number) in which
courses would be held" and allows students to filter classes based on location.  Compl. ¶¶ 118-
119; *see also id.* ¶ 124 (discussing course location information in syllabi).  But identifying a
course's room number merely "expresse[s] an expectancy."  *Basch*, 370 A.2d at 1368.  The
Course Catalog offers "information concerning what the prospective student may expect when he
or she enters the university community," not binding obligations.  *Id.* at 1367; *see also Mosby-
Nickens*, 864 F. Supp. 2d at 99.  If building and room numbers were contractually binding,
American could never relocate a class.  No reasonable student would think—and no university
would intend—that a class scheduled for Room 302 could not contractually be moved to Room
402.  Nor does a search filter for "Location" contractually promise in-person instruction, any
more than the filter for "Course Type" promises that a course will not be converted to a seminar
from a lecture if the course is undersubscribed, or the filters for "Day of Week" and "Time of
Day" promise that a course will not change timeslots.  If, due to too few students signing up,
Psychology 101 is changed from a lecture to a discussion seminar and is moved from Monday
morning to Thursday afternoon, a student could not sue over it.  The Course Catalog expresses
the University's expectancy for course offerings—it makes no contractually enforceable
promises.

*Sixth*, Plaintiffs cite (but do not quote) "strict personal attendance requirements as set forth in various departmental policies and handbooks" and in course syllabi.  Compl. ¶¶ 120, 124.  They say that these requirements are evidence of a "requirement that … students physically attend such classes on campus," *id.*, but this conclusion does not follow:  Attendance and participation in class are equally important whether classes are held online or in person.  "Strict personal attendance requirements" do not prove an obligation to provide in-person instruction no matter the circumstances.

*Finally*, Plaintiffs appear to suggest that an obligation to provide in-person instruction no matter the circumstances arises from custom, given that before the pandemic "students attended physical classrooms to receive in-person instruction, and Defendant provided such in-person instruction."  Compl. ¶¶ 122-123, 125.  Plaintiffs offer no reason why contract terms alleged to be based in the parties' usual conduct should dictate American's obligations in times that are anything but usual.  That American usually provides in-person instruction says nothing about its intent to be bound to do so when a world-altering global pandemic has reshaped the facts that justify or permit that usual course.  *See Howard Univ. v. Best*, 484 A.2d 958, 974 n.14 (D.C. 1984) (stating that evidence of custom or usage is admissible to show "all those general *and unvarying* incidents which a uniform usage annexes" (quoting Restatement (First) of Contracts § 246 (1932)) (emphasis added)); *Itek Corp. v. First Nat'l Bank of Boston*, 566 F. Supp. 1210, 1216 (D. Mass. 1983) (where party to a contract had agreed to litigate disputes in courts of Iran prior to 1977 revolution as a matter of custom, holding that "[w]hat was contractually 'customary' and 'necessary' in 1977 does not, in the face of dramatically changed circumstances, exert binding force on the parties and this Court").  Thus, American's previous customary

practice cannot create a definite, unalterable contractual obligation to continue that practice, especially one enforceable in the least customary times.

In sum, Plaintiffs point to nothing plausibly creating an obligation to provide on-campus classes that is "definite in its terms" and that the University intended to be binding.  Nor do Plaintiffs plausibly allege a contract-by-mosaic that strings together unenforceable individual statements into an unspoken, unwritten promise to provide in-person learning—let alone a promise that links in-person learning to the amount charged for tuition.

### 2. Plaintiffs Allege No Contractual Obligation Regarding Fees

Plaintiffs fare no better in their efforts to prove breach of a contract pertaining to fees. They rely on four fees, but none establishes an obligation to provide in-person services that American has breached.  *First*, the Student Activity Fee is charged "[t]o finance … student-run organizations and programs" that aim to "contribute significantly to the intellectual and social development of the student body, service the university academic goals, encourage student participation and leadership, and enhance the general campus environment."  Compl. ¶ 160.  But this language does not make any particular obligation that is "definite in [its] terms" or render certain what services American is supposed to provide in exchange for this fee, such that it cannot create a contractual obligation under D.C. law.  *Basch*, 370 A.2d at 1367.  Moreover, this fee's description in no way limits its applicability to on-campus services.  While Plaintiffs complain that they could not "participate in on-campus student activities" during the pandemic, Compl. ¶ 40, they nowhere allege that there are no ongoing off-campus or online activities supported by this fee.

*Second*, Plaintiffs complain that American has breached its obligations pertaining to the Sports Center Fee because Plaintiffs cannot access recreational facilities.  Compl. ¶ 165.  But the description of this fee makes clear that it "is *not* a membership fee for use [of] the fitness center."

*Id.* ¶ 161 (emphasis added).  Rather, the fee is charged "to all registered students"—without

reference to whether the student is participating in an in-person or online program—"to help pay

for building maintenance and service costs associated with the sports center complex."  *Id.*

Plaintiffs thus cannot show that this fee creates an obligation on American's part to grant them

access to fitness or recreation facilities.

*Third*, Plaintiffs say that American has breached its obligation to provide "on-campus

printing facilities" and "access to campus-based information technology resources" supported by

the Technology Fee.  Compl. ¶ 165.  But this fee—again "charged to all registered students,"

both online and in-person—is in no way directly tied to the provision of those specific services.

To the contrary, the fee is intended "to help pay a small portion of the university's overall

technology costs" and makes available technology services "[w]hether a student lives on-

campus, off-campus, or abroad."  *Id.* ¶ 163.  Plaintiffs thus cannot identify any obligation to use

the Technology Fee for particular, in-person services.  (Indeed, given the significant

technological resources required to provide online instruction to the entire student body during

the pandemic, there is every reason to think that the Technology Fee is being put to its full use.)

*Finally*, Plaintiffs complain that they did not have "access to metrobus transportation for

a portion of the Spring 2020 semester."  Compl. ¶ 165.  The Metro U-Pass Fee provides for

"unlimited Metrorail and Metrobus transportation for the duration of the semester," *id.* ¶ 163—

and providing unlimited access to the Metrorail and Metrobus services offered by the

Washington Metropolitan Area Transit Authority (WMATA) is exactly what American did.  If

transit services were curtailed, that was not American's responsibility; it was WMATA's.

Plaintiffs identify nothing making American itself responsible for providing them with transit

services—and they do not allege that they were deprived of Metro*rail* transport, such that their
U-Pass Fee still provided them with access to transportation services.  *See* Compl. ¶ 165.

### B.  Plaintiffs Have Failed To Allege Any Breach

Plaintiffs' failure to plausibly allege a sufficiently definite and enforceable promise for
on-campus learning suffices to require the complaint to be dismissed.  And as for what
American's agreements with its students—in the 2019-2020 University Catalog, with relevant
portions attached as Exhibit A,[15] *Basch*, 370 A.2d at 1366—*do* provide, Plaintiffs have alleged
no breach.  To the contrary, Plaintiffs received exactly what they bargained for during the
pandemic:  They continued to consume the education provided by American, they received the
course credits they were expecting, and they progressed toward the completion of their degrees.

First, the breach of contract claim on behalf of the Fee Class is readily disposed of.  The
Catalog states that each of the four fees that Plaintiffs rely on is "nonrefundable."  Ex. A at 5.
Indeed, Plaintiffs themselves quote a description of one particular fee (the Activity Fee) as
nonrefundable in their complaint.  Compl. ¶ 160.  This language forecloses Plaintiffs' contract
claim to recover fees.  *See, e.g.*, *Martin v. United Airlines, Inc.*, 727 F. App'x 459, 462-63 (10th
Cir. 2018) (plaintiffs had no breach of contract claim for refund of airline ticket payments where
contract specified that the payments were nonrefundable).

The contract claim for the Tuition Class fares no better.  The Catalog makes clear that
(1) tuition is tied to credits received, not to the means of instruction, and (2) that American
retains discretion to shape both its curriculum and its charges.  Turning to what the Catalog says
about how tuition is set, for full-time undergraduate students like Plaintiffs, the amount of tuition

---

[15]      The full 2019-2020 University Catalog can be found online at https://www.american.edu/
provost/registrar/university_catalog.cfm.

paid corresponds to the number of credit hours taken.  *See* Ex. A at 3 (setting tuition rates for undergraduate students based on whether student takes fewer than 12, 12-17.5, 18, or more than 18 credit hours per semester).  Plaintiffs do not allege that they were deprived of the credit hours they paid for, and so they do not plausibly allege any failure by American to live up to its end of the parties' bargained-for exchange.  Moreover, while the Catalog says that students participating in semester-long off-campus programs pay tuition at a different rate than those attending on-campus programs, it likewise provides that full-time undergraduates who participate in these off-campus programs "are assessed tuition at the on-campus full time rate."  *Id.*  In other words, for undergraduates like Plaintiffs, tuition does not vary based on where the learning takes place or what particular array of services are made available.

The Catalog's policies for tuition refunds when a student withdraws are instructive.  The Catalog makes clear there is "[n]o refund for course drop/withdrawal after the fourth calendar week of classes."  Ex. A at 9.  And so a student who withdrew from the University on March 10—the day American announced that, following the conclusion of spring break, classes would shift online as a result of COVID-19—would receive no tuition refund, even though he was not receiving any educational services at all (in-person or otherwise).  Plaintiffs could hardly understand themselves to be entitled to a more generous refund policy where all their classes were conducted through semester's end (though in a different format) and they obtained the course credit they expected.

Apart from the Catalog's statements about tuition, it also reserves to American discretion to change its policies and practices.  The Catalog provides that "American University reserves the right to amend the policies and information contained in the University Catalog from time to time, with or without notice."  Ex. A at 2.  This right necessarily includes the right to shift the

method of instruction if circumstances dictate that providing in-person instruction is unsafe or infeasible.  This reservation thus precludes Plaintiffs' contract claims.  *See Beukas v. Bd. of Trs. of Farleigh Dickinson Univ.*, 605 A.2d 708, 708-09 (N.J. Super. Ct. 1992) (finding that university officials' reservation of right in university bulletins to eliminate any college within university subject only to giving adequate notification to its students precluded recovery under express contract theory); *cf. Eisele v. Ayers*, 381 N.E.2d 21, 26 (Ill. App. Ct. 1978) (where university catalog provided that tuition rates were subject to change "without notice" or "on short notice," students could not sue for year-over-year increases of tuition absent allegations of malice or bad faith).

Taken together, the agreement's actual terms defeat Plaintiffs' demand that American refund their tuition and fees.  Plaintiffs accepted exactly what the Catalog promised them: instruction resulting in credits toward an American degree.  Their breach of contract claims therefore must be dismissed.

## C.    D.C. Law Counsels Against Second-Guessing Educational Judgments

Reinforcing the conclusion that American never promised in-person instruction is a body of District of Columbia law cautioning courts to leave decisions about academic programs, the granting of course credit, and the issuance of degrees to educators.  American invested significant effort and resources into making and executing exactly these kinds of decisions as it determined how best to protect its students' health and safety and ensure the continuity of its students' educations in the face of the pandemic.

In D.C. and elsewhere, discretionary educational decisions are "left to the sound judgment of … professional educators."  *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1109 (D.C. 1999).  When courts are asked to "determin[e] whether a university has complied with its own rules or contract, … 'a court must be careful not to substitute its judgment improperly for the

academic judgment of the school.'"  *Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006)

(quoting *Neiman v. Yale Univ.*, 851 A.2d 1165, 1172 (Conn. 2004)) (second alteration in

original).  Courts thus will not adjudicate the quality or value of the education a university

provided.  As the D.C. Court of Appeals has explained, courts cannot make these assessments,

given "(1) the lack of a satisfactory standard of care, (2) the 'inherent uncertainties' about the

cause and nature of damages, (3) the 'potential it presents for a flood of litigation against

schools,' and (4) the threat of 'embroiling the courts into overseeing the day-to-day operations of

the schools.'"  *Brantley v. Dist. of Columbia*, 640 A.2d 181, 184 (D.C. 1994) (quoting *Ross v.

Creighton Univ.*, 957 F.2d 410, 414 (7th Cir. 1992)); *see also Alden*, 734 A.2d at 1108 (D.C.

1999) (observing that the court had previously "declin[ed] to engage in judicial review of

academic decision-making by educational institutions"); *Allworth*, 890 A.2d at 202 ("[C]oncepts

of academic freedom and academic judgment are so important that courts generally give

deference to the discretion exercised by university officials.").[16]

This deference extends to both academic decisions and other facets of campus and

university life, including fees assessed for non-curricular campus services, because determining

which university services are "educational" is itself an exercise in judgment that requires

"inquir[ing] into the nuances of educational processes and theories."  *Roe v. Saint Louis Univ.*,

---

[16]     The case law is consistent across jurisdictions.  *See, e.g., Andre v. Pace Univ.*, 655
N.Y.S.2d 777, 779 (N.Y. App. Div. 1996) ("To entertain a cause of action for 'educational
malpractice' would require the courts not merely to make judgments as to the validity of broad
educational policies—a course we have unalteringly eschewed in the past—but, more
importantly, to sit in review of the day-to-day implementation of these policies." (quoting
*Donohue v. Copiague Union Free Sch. Dist.*, 391 N.E.2d 1352, 1354 (N.Y. 1979))); *Atria v.
Vanderbilt Univ.*, 142 F. App'x 246, 251 (6th Cir. 2005) (stating that claims are barred if they
"challenge the adequacy of the education that Vanderbilt provided"); *Lucero v. Curators of Univ.
of Mo.*, 400 S.W.3d 1, 8 (Mo. Ct. App. 2013) (Missouri courts have "emphasized that it is not
[their] place to micromanage a university's daily operations" and that "universities must be
allowed the flexibility to manage themselves.").

2012 WL 6757558, at *10 (E.D. Mo. Dec. 31, 2012), *aff'd*, 746 F.3d 874 (8th Cir. 2014).  As a result, where campus services are "integrally related to the educational process and to student wellbeing," claims over those services are beyond proper judicial determination.  *McClean v. Duke Univ.*, 376 F. Supp. 3d 585, 609 (M.D.N.C. 2019) (plaintiff's allegations that the university failed to provide her with counseling services it had advertised or promised were barred); *see also Roe*, 2012 WL 6757558, at *10 ("[I]t would require the Court to inquire into the nuances of what should be determined 'state of the art' physical training program.").

Courts have applied this doctrine to forbear from diverse educational disputes—including schools not just reformatting but cancelling classes in a national crisis.  In *Paynter v. New York University*, 319 N.Y.S.2d 893 (N.Y. App. Div. 1971), a parent sought a tuition refund after New York University cancelled what remained of the semester following the Kent State shootings. The appellate court reversed a judgment for the parent, holding that "the court erred in substituting its judgment for that of the University administrators and in concluding that the University was unjustified in suspending classes for the time remaining in the school year prior to the examination period."  *Id.* at 894.  The court then noted that "while in a strict sense, a student contracts with a college or university for a number of courses to be given during the academic year, the services rendered by the university cannot be measured by the time spent in a classroom."  *Id.*  *Paynter* thus shows that education cannot be evaluated mechanically, and universities have leeway, not subject to judicial review, to shape the educational process in response to extrinsic events.

American stands behind the quality and value of the education it delivered during the pandemic.  Shifting instruction online was not as simple as flipping a switch:  Ensuring that the entire American student body could continue receiving instruction online required an

unprecedented investment of time, resources, and energy on the part of the University, its

faculty, and its staff.  The instruction offered by American satisfied its standards, and American

granted course credit to students who completed their classwork online.  Indeed, all three

Plaintiffs continued to receive instruction during the pandemic and received academic credit.

Plaintiffs ask this Court to second-guess American's judgment that the instruction it offered met

the University's exacting standards and find that the credits Plaintiffs earned are somehow worth

less than would have otherwise been the case.  Plaintiffs do not allege that they paid for credits

that they did not receive.  They instead seek damages or disgorgement (*see* Compl. ¶¶ 136, 152,

171, 183, 194, 211) for "the difference between the value of the online learning which is being

provided versus the value of … live in-person instruction in a physical classroom." *Id.* ¶ 136.

Plaintiffs would therefore have the Court appraise the difference between an online and

on-campus American semester.  Under settled D.C. law, courts do not make such assessments.

The logic of this principle proves itself here.  What would the deliberations look like for the

claims of a hypothetical English major:  Is an online discussion section in her World Literature

class less valuable than pre-pandemic in-person sessions?  What about large lecture classes with

less individual interaction?  If so, is it worth $1,000 less?  Or $2,000?  What if the student

continues to use online library services, or if she never used the library in the first place?  Did the

student's online coursework truly merit the credit toward her American degree?  Who's to decide

besides American itself?

To answer these questions, the Court would have to make determinations outside the

scope of judicial review.  *See* Blum, Annotation, Tort Liability of Public Schools and Institutions

of Higher Learning for Educational Malpractice, 11 A.L.R. 7th Art. 5 (2016) ("If a claim

requires an analysis of the quality of education received and, in making that analysis, the fact

finder must consider principles of duty, standards of care, and the reasonableness of the defendant's conduct, then the claim is one of educational malpractice.").  Plaintiffs try to circumvent this problem with the conclusory allegations that they "do[] not seek to allege 'academic malpractice'" and that this is instead a question of evaluating the provision of "a cognizable and distinct product, that being live, in-person, on-campus education, with its featured ancillary and related services."  Compl. ¶¶ 129-130.  These allegations cannot help Plaintiffs avoid the rule against review.  Federal courts do not permit "artful pleading that recasts the terms of a dispute to make it one properly reviewed by courts."  *El-Shifa Pharma. Indus. Co. v. U.S.*, 559 F.3d 578, 585 n.2 (D.C. Cir. 2009), *vacated and subsequently affirmed en banc*, 607 F.3d 836, 843 (D.C. Cir. 2010).  And what is Plaintiffs' claim if not a challenge to the quality and adequacy of the remote learning required by the pandemic?  The complaint is filled with allegations concerning subjective differences in the quality of standard in-person and online education.  *See, e.g.*, Compl. ¶¶ 52-53, 57, 101, 132, 143, 202(b).  And Plaintiffs themselves characterize their claims as seeking the difference between the value of the in-person education they say they were promised and the remote instruction they received.  *E.g.*, *id.* ¶ 136. The Court cannot make this assessment without answering the kinds of questions that place disputes like these outside the judicial purview[17] and that would invite unlimited judicial oversight of educational discretion.[18]  Under settled D.C. law, these claims should not proceed.

---

[17]     Plaintiffs do not avoid these problems by seeking refunds "on a pro-rata basis."  Compl. ¶ 4.  Prorating tuition requires determining by what percentage it should be prorated.  Unless the Court were to find that the value of American's online courses is zero—not an allegation Plaintiffs themselves could even plausibly make, given that all received course credit—choosing the proration percentage would still require the Court to answer all the questions above that other courts have found are not susceptible to judicial review.

[18]     The threat that litigation would proliferate is palpable.  If the Court entertained claims like Plaintiffs', what would prevent a student from suing for a partial tuition refund if the tenured professor listed as teaching a class in the course catalog fell ill partway through a semester and

## II.   PLAINTIFFS' OTHER CAUSES OF ACTION ALSO SHOULD BE DISMISSED

### A.   Plaintiffs Fail To State A Claim For Unjust Enrichment

Plaintiffs' two claims for unjust enrichment—one apiece on behalf of the Tuition Class

and Fee class—should be dismissed.  At the threshold, "there can be no claim for unjust

enrichment when an express contract exists between the parties."  *Albrecht v. Comm. on Emp.*

*Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 69 (D.C. Cir. 2004).  Nor will an

unjust enrichment claim lie when an "implied" contract covers the matter in dispute.  *Schiff v.*

*AARP*, 697 A.2d 1193, 1194 n.2 (D.C. 1997).  Since Plaintiffs allege an express or implied

contract, their unjust enrichment claim cannot proceed.

Nor can Plaintiffs plead unjust enrichment in the alternative.  Compl. ¶¶ 138, 140, 173.

The D.C. Court of Appeals has *already* held "that the relationship between a university and its

students is contractual in nature" and that "the terms set down in a university's bulletin become a

part of that contract."  *Basch*, 370 A.2d at 1367.  As discussed above, the terms of the documents

that make up that contractual relationship directly address tuition and fees and do so without

linking that to any promise of in-person instruction.  *See supra* at 14-16.  Here, everyone

(including the D.C. Court of Appeals) agrees that an enforceable contract exists, and it covers the

subject matter of the litigation.  The only dispute is over its terms.  Unjust enrichment cannot

proceed in these circumstances.

In any event, Plaintiffs fail to plausibly allege unjust enrichment.  "Unjust enrichment

occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the

---

her class was taught by a graduate student instead?  And what would stop a lawsuit from a
student who believes her university's decision to change a course advertised in the catalog as
graded to pass/fail diminishes the value of her degree?  Or what about a lawsuit that seeks a pro
rata refund every time classes are cancelled for adverse weather?  This is a slippery slope on
which this Court should not embark.

benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005).  At bottom, "the doctrine of unjust enrichment depends on whether it is fair and just for the recipient to retain the benefit." *4934, Inc. v. Dist. of Columbia Dep't of Emp. Servs.*, 605 A.2d 50, 56 (D.C. 1992).  This is where Plaintiffs' claim falls short.  They allege no facts showing that American *inequitably* retained their tuition or fees.  They do not contend that American used their tuition or fees for noneducational or improper purposes.  Instead, they admit that—consistent with the University's educational goals—they accepted online instruction, received credit for it, and made progress toward their degrees.  *See* Compl. ¶ 51.  When a plaintiff benefits from the defendant's retention of the original benefit, that retention is not unjust, and the claim fails.  *See Roebling v. Dillon*, 288 F.2d 386, 387 (D.C. Cir. 1961); *cf. Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv.*, 885 F. Supp. 2d 156, 188-89 (D.D.C. 2012).  This principle has been applied to bar claims like Plaintiffs' for refunds where universities have responded to crises by investing students' tuition and fee payments into students' education, even if the means of that education is not what students expected.  *See, e.g.*, *Roe v. Loyola Univ. New Orleans*, 2007 WL 4219174, at *2-3 (E.D. La. Nov. 26, 2007) (where defendant law school closed for Hurricane Katrina but allowed students to take classes at other law schools conditioned on payment of tuition to defendant, defendant was not unjustly enriched by retention of tuition because plaintiff "received full credit for the courses he took [at another law school] and, by receiving this credit, … was able to graduate and sit for the bar, on time, something to which he ascribes value"); *see also Krebs v.*

*Charlotte Sch. of Law, LLC*, 2017 WL 3880667, at *6 (W.D.N.C. Sept. 5, 2017); *Moss v. Wayne State Univ.*, 2009 WL 4344193, at *2 (Mich. Ct. App. Dec. 1, 2009).[19]

Apart from Plaintiffs' failure to allege its elements, the unjust enrichment claim should be dismissed under D.C. law foreclosing claims again a university's academic decision-making, discussed above.  No court in the District of Columbia has ever permitted an unjust enrichment claim against a university for failure to provide an allegedly promised level or quality of education.

### B.   Plaintiffs Fail To State A Claim For Conversion

Plaintiffs' conversion claim, which contends that American has "converted and continues to convert Plaintiffs' … 2020 Spring semester tuition and fees," Compl. ¶ 194, fails for four independent reasons.

*First*, conversion claims for money must identify specific funds, not a general obligation to pay money.  *Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 130 F. Supp. 3d 236, 258 (D.D.C. 2015); *McNamara v. Picken*, 950 F. Supp. 2d 193, 195 (D.D.C. 2013) (plaintiff must allege that defendant put "*those exact funds*" to an improper purpose).  The complaint does

---

[19]   This result holds even given Plaintiffs' bald allegation that providing remote classes is somehow cheaper for the University than providing classes and services in person.  Compl. ¶¶ 147-148.  American recognizes that the Court must accept Plaintiffs' allegations as true for purposes of a motion to dismiss, but this allegation is simply false:  A month into the transition to online learning, American had experienced a $27 million *shortfall* as a result of COVID-19.  *See* Letter from Sylvia M. Burwell to the AU Community (Apr. 17, 2020), *available at* https://www.american.edu/president/announcements/april-17-2020.cfm.  More to the point for purposes of the present motion, the relevant test is not whether Plaintiffs paid the exact amount needed for the specific services they intended to receive; it is rather whether the money they paid to the University is being used for their benefit.  *Moss*, 2009 WL 4344193, at *2 (where university charged a "contingency fee" to protect against state budget shortfalls that did not materialize, rejecting plaintiff's argument that university was unjustly enriched by failing to refund that fee where students "gained a general benefit from the university's expenditures, which included spending in areas that would directly benefit students").  Plaintiffs make no allegation to that effect, and thus they fail to state a claim for unjust enrichment.

not. *See* Compl. ¶¶ 184-194. A claim for "a refund or credit for an overcharge … fails to state a claim for conversion." *Campbell*, 130 F. Supp. 3d at 259. Tuition and funds are "fungible cash … that may not underlie a claim for conversion." *McNamara*, 950 F. Supp. 2d at 195 (dismissing conversion claim where plaintiff alleged only that he contributed to general accounts and that money from the general accounts was misdirected); *see also Edwards v. Ocwen Loan Servicing, LLC*, 24 F. Supp. 3d 21, 31 (D.D.C. 2014) ("A conversion claim cannot stand where, as here, plaintiff is owed *at most* some unspecified, unidentified portion of a larger pool of funds." (emphasis in original)).

*Second*, the conversion claim impermissibly duplicates Plaintiffs' contract claims. Both claims turn on the contention that American may not retain funds paid to it in exchange for unperformed services under a contract. That is a contract claim—not a claim for conversion. *See Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 n.13 (D.C. 2008) ("Failure by a contracting party to pay the contract price or debt … is not a conversion but merely breach of contract."); *McNamara*, 950 F. Supp. 2d at 195.

*Third*, Plaintiffs do not plausibly allege conversion because they acknowledge that American transitioned to online learning, enabling students to continue to avail themselves of University resources and services. *See* Compl. ¶ 51. To state a claim for conversion, Plaintiffs must allege that American diverted their funds "in denial or repudiation of [Plaintiffs'] right to" the disputed property. *Shulman v. Voyou, LLC*, 251 F. Supp. 2d 166, 170 (D.D.C. 2003). Plaintiffs make no such allegation. Plaintiffs themselves continued to attend and participate in classes, received credit, and made progress toward their degrees. And, as discussed above, American made significant efforts to make the transition to online learning as seamless as possible. Indeed, given the University's effort to continue students' education despite the

pandemic, Plaintiffs can hardly allege that American used the money they paid for anything but its intended purposes.

*Finally*, the conversion claim fails because, like the contract and unjust enrichment claims, it invites the Court to insert itself into American's academic decision-making. Because the Court cannot decide the conversion claim without engaging in the inquiries described above, the claim should be dismissed.

### C.  Plaintiffs Fail To State A Claim Under The D.C. Consumer Protection Procedures Act

Finally, Plaintiffs' claims under the D.C. Consumer Protection Procedures Act (CPPA) should be dismissed for numerous reasons. At the threshold, the CPPA makes clear that the kind of educational activity underlying Plaintiffs' claim is not cognizable under the statute. Plaintiffs file their claim under D.C. Code § 28-3905(k), which allows consumers to bring actions in court challenging trade practices allegedly in violation of D.C. law. But this provision contains an important limitation: "An action brought by a person under this subjection against a nonprofit organization shall not be based on membership in such organization, membership services, [or] training or credentialing activities." *Id.* § 28-3905(k)(5). American is a non-profit under the statute. *Id.* § 28-3901(a)(14); *see also, e.g.*, *Burka v. Aetna Life Ins. Co.*, 87 F.3d 478, 479 (D.C. Cir. 1996); *American Univ. in Dubai v. Dist. of Columbia Educ. Licensure Comm'n*, 930 A.2d 200, 202 n.3 (D.C. 2007). Plaintiffs' claims about the method of instruction—instruction leading to course credit and, eventually, university degrees—pertain to "training or credentialing activities." *See Train*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/train (last accessed September 30, 2020) (defining "train" as "to teach so as to make fit, qualified, or proficient" or "to form by instruction, discipline, or drill"); *Credential*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/credential (last

accessed Sept. 30, 2020) (defining "credential" as "to furnish with credentials," in turn defined as "something that gives title to a credit or confidence," and listing an example as "to credential adequate academic performance").  And Plaintiffs' claims concerning ancillary aspects of student status at American—for instance, access to campus facilities and participation in student events—similarly qualify as "membership services."  Plaintiffs' claims thus fall within the CPPA's statutory bar of certain claims against nonprofits and must be dismissed.  *See Sanoian v. George Washington Univ.*, No. 18-CV-911, at 5 (D.C. Mar. 3, 2020) (attached as Exhibit B) (addressing lower court ruling that CPPA was inapplicable because "a 'law degree is a training and credentialing activity,'" declining to address "difficult question[]" of whether provision of financial aid qualifies as "training and credentialing activity," and affirming on alternate ground).

Even apart from the nonprofit exception, Plaintiffs' claims still are not within the scope of the CPPA.  The CPPA "'was designed to police trade practices arising only out of consumer-merchant relationships' and does not apply to commercial dealings outside the consumer sphere."  *Ford v. Chartone, Inc.*, 908 A.2d 72, 81 (D.C. 2006) (quoting *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C. 1981)) (collecting cases).  Thus, the statute only applies to "consumer" "goods and services."  D.C. Code §§ 28-3901(a)(2), 28-3904(a), 28-3905(k)(1)(A).  The statute defines consumer goods and services as ones bought "for personal, household, or family purposes," *id.* § 28-3901(a)(2)(B)(i), and the D.C. Circuit has noted that this excludes "transactions intended primarily to promote business or professional interests," *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1043 (D.C. Cir. 2010).  Courts interpreting similar statutes in other states have held that because students pursued their degrees with an eye toward future employment rather than "for dilettantish reasons" or "with no intention of using it to make money," their payment for educational services was for business or professional reasons and thus

was not a cognizable consumer transaction.  *MacDonald v. Thomas M. Cooley Law Sch.*, 724

F.3d 654, 661-62 (6th Cir. 2013) (Michigan law).  The same principle serves to place Plaintiffs'

claims outside the scope of the CPPA.

Plaintiffs' CPPA claim fails for other reasons as well.  The crux of their claim is that

American's purported representation that they "would receive in-person educational services,

experiences, and opportunities" either misrepresented or failed to state the true nature or quality

of the remote instruction provided during the pandemic.  Compl. ¶ 202.  But as discussed above,

American never promised Plaintiffs that they would receive in-person instruction regardless of

extenuating circumstances—American simply laid out what it validly expected the semester

would look like.  *Supra* at 8-12.  This kind of statement of future expectation is not actionable

under the CPPA.  *See Cannon v. Wells Fargo Bank, N.A.*, 926 F. Supp. 2d 152, 174 (D.D.C.

2013) (citing *Howard*, 432 A.2d at 706).

Moreover, Plaintiffs' complaint argues that American's statements had a "tendency to

mislead."  Compl. ¶ 202; *see also* D.C. Code § 28-3904(e), (f), (f-1).  Of course, nobody could

have predicted that the pandemic would arrive and that government orders would demand

changes to the method of instruction.  Plaintiffs thus fault American for omitting to mention a

circumstance that nobody saw coming and that existed outside its control.  But this Court should

not deem American to have made statements about its educational services that "tend to mislead"

where any discrepancy between those statements and the services American provided to

Plaintiffs during the latter part of the Spring 2020 semester arose only because of an

unforeseeable pandemic and ensuing government mandates—not because of anything intrinsic to

American's representations themselves.

Finally, Plaintiffs' CPPA claim should be dismissed under the same principles discussed above barring claims that challenge academic decision-making.  This claim directly asks the Court to evaluate the quality and value of the education American provided Plaintiffs during the pandemic.  *See, e.g.*, Compl. ¶ 202(a), (b), (f).  Thus, even setting aside the CPPA's bar on challenges to a nonprofit organization's "training and credentialing activities," this claim should be dismissed under settled principles.

## III.   PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

Plaintiffs' complaint should be dismissed with prejudice.  Through consolidation, the complaint adds new allegations that did not appear in any of the original *Qureshi*, *Rabinowitz*, or *Arif* complaints—including, for the first time, allegations about American's course catalog and academic policies.  But these amended allegations still do not state a claim.  The problem is not with Plaintiffs' allegations, but with their legal theories.  Because amendment would be futile, dismissal should be with prejudice.  *Vince v. Mabus*, 956 F. Supp. 2d 83, 92 (D.D.C. 2013) (citing *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996); *Carty v. Author Sols., Inc.*, 789 F. Supp. 2d 131, 135-36 (D.D.C. 2011)).

## CONCLUSION

For these reasons, Plaintiffs' complaint should be dismissed in its entirety with prejudice.

Dated: September 30, 2020          Respectfully submitted,

*/s/ Alan E. Schoenfeld*
Alan E. Schoenfeld (admitted *pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 937-7294
alan.schoenfeld@wilmerhale.com

Danielle Y. Conley (#503348)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
 (202) 663-6006
danielle.conley@wilmerhale.com

*Attorneys for Defendant American University*